UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HEATHER HARRINGTON,
     Plaintiff,


     v.                                    CIVIL ACTION NO.
                                           14-12333-MBB

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, GREEN TREE
SERVICING, LLC, and
ORLANS MORAN PLLC,
     Defendants.



**MEMORANDUM AND ORDER RE:**
**DEFENDANTS FEDERAL NATIONAL MORTGAGE ASSOCIATION AND**
**GREEN TREE SERVICING LLC'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 58)**

**June 27, 2016**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by defendants Federal National Mortgage Association ("Fannie Mae") and Ditech Financial LLC, formerly known as Green Tree Servicing, LLC ("Green Tree") (collectively "defendants") pursuant to Fed.R.Civ.P. 56 ("Rule 56").  (Docket Entry # 58).  Plaintiff Heather Harrington ("plaintiff") opposes the motion.  (Docket Entry # 62).  After conducting a hearing on March 3, 2016, this court took the motion under advisement.  (Docket Entry # 58).

PROCEDURAL BACKGROUND

The parties' dispute arises out of a settlement agreement regarding a note and a mortgage on a property belonging to plaintiff.  When plaintiff first filed an eight count complaint ("original complaint") on May 12, 2014 (Docket Entry # 1-3), defendants and Orlans filed motions to dismiss (Docket Entry ## 6 & 13).  In response, plaintiff filed a motion to amend the original complaint.  (Docket Entry # 12).  Plaintiff subsequently filed a second motion to amend (Docket Entry # 26) and this court deemed the aforementioned motions moot.  (Docket Entry # 31).

On May 21, 2015, this court allowed in part and denied in part plaintiff's second motion to amend.  (Docket Entry # 37, p. 40).  In light of that Order, on June 9, 2015, plaintiff filed an amended complaint that set out two claims, one for of breach of contract based on the settlement agreement (Count I) and the other for breach of implied covenant of good faith and fair dealing (Count II).  (Docket Entry # 40).  The Order limited the breach of contract claim to a claim that defendants allegedly breached the settlement agreement based on the "failure to issue corrections to the credit reporting agencies as required by the settlement agreement."  (Docket Entry # 37, pp. 21-22).  Defendants move for summary judgment on both claims.  (Docket

2

Entry # 58).  Plaintiff opposes the motion and contends that genuine issues of material fact preclude summary judgment. (Docket Entry # 62, p. 1).

## STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Federal Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).  The evidence is viewed "in the

light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor.  Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material."  Fed.R.Civ.P. 56(c)(1); see Ahmed v. Johnson, 752 F.3d at 495.  "Unsupported allegations and speculation," however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

Defendants filed a LR. 56.1 statement of undisputed facts. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record.[1]  See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); Stonkus v. City of Brockton School Department, 322 F.3d 97, 102

---

[1]  Statements of law in the statement of undisputed facts are not considered.

(1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that the plaintiff failed to controvert). Adhering to this framework, the record sets out the following facts.

<u>FACTUAL BACKGROUND</u>

On July 13, 2006, GMAC Mortgage Services, LLC ("GMAC") agreed to a Mortgage Selling and Servicing Contract (the "Servicing Contract") with the Federal National Mortgage Association ("Fannie Mae"). (Docket Entry # 60, ¶ 8) (Docket Entry # 60-3). The terms of the Servicing Contract permitted GMAC as a lender to sell and service mortgages on behalf of Fannie Mae. (Docket Entry # 60-3). The Servicing Contract also provided the terms of such servicing. (Docket Entry # 60-3). Loan servicers such as GMAC "are required to service the loans in accordance with a set of guidelines for the management and servicing of Fannie Mae loans, called the Fannie Mae Single Family Servicing Guide." (Docket Entry # 60, ¶ 4). The relevant guide depicts servicers, such as GMAC, "as independent contractors and not as agents, assignees, or representatives of Fannie Mae." (Docket Entry # 60-1, p.3). Fannie Mae allowed GMAC to establish its own policies in connection with servicing mortgages, including giving GMAC discretion to enter into

agreements in connection with mortgage servicing on behalf of Fannie Mae.  (Docket Entry # 60-1, p.7).

On December 1, 2006, plaintiff signed a note in the principal amount of $264,000 ("the note" or "the loan") payable to Infinity Mortgage Company, Inc. ("Infinity") and a mortgage ("the mortgage") granting Infinity a security interest in the property located at 40 Lyman Drive in Milton, Massachusetts ("the property").  (Docket Entry # 58-1, ¶ 1) (Docket Entry # 62, p. 6, ¶ 1).[2]  Immediately after origination, the note was assigned to GMAC Bank, which came to be known as Ally Bank ("Ally"), and the mortgage was assigned to Mortgage Electronic Registration Systems, Inc. ("MERS").  (Docket Entry # 58-1, ¶ 2) (Docket Entry # 62, p. 7, ¶ 2).

On or about January 1, 2007, Fannie Mae purchased the note from Ally.  (Docket Entry # 60, ¶ 2).  Fannie Mae does not service the loans that it owns.  (Docket Entry # 58-1, ¶ 4) (Docket Entry # 62, p. 7, ¶ 4, ln. 1) (Docket Entry # 60, ¶ 3). On January 1, 2007, GMAC Mortgage, LLC ("GMAC") began servicing the loan on behalf of Fannie Mae.  (Docket Entry # 59, ¶ 2).[3] Fannie Mae's loan servicers establish their own policies and

_____

[2]  Page numbers refer to the docketed page numbers.
[3]  Under the Mortgage Selling and Servicing Contract dated July 13, 2006, GMAC agreed to service plaintiff's loan with Fannie Mae in accordance with the Fannie Mae Single Family Servicing Guide.  (Docket Entry # 58-1, p. 3, ¶ 4) (Docket Entry # 60, ¶ 4).

written procedures for conducting their loan servicing
operations.  (Docket Entry # 58-1, ¶ 5) (Docket Entry # 62, p.
7, ¶ 5).  Fannie Mae does not provide the servicers with
facilities, buildings, equipment, printers, office furniture or
fax machines.  (Docket Entry # 60, ¶ 5).  Fannie Mae does not
pay the servicers' employees or control how the servicers pay
their employees.  (Docket Entry # 58-1, ¶ 7) (Docket Entry # 62,
p. 7, ¶ 7) (Docket Entry # 60, ¶ 6).

        In December 2008, plaintiff was laid off from her
employment.  (Docket Entry # 58-1, ¶ 11) (Docket Entry # 62, p.
8, ¶ 11).  Subsequently, she failed to make the required
mortgage payments and defaulted under the terms of the note.
(Docket Entry # 58-1, ¶ 11) (Docket Entry # 62, p. 8, ¶ 11).
GMAC reported that the account was past due between February
2009 and January 2013 to two credit reporting agencies.  (Docket
Entry # 58-1, ¶¶ 13, 14) (Docket Entry # 62, p. 8, ¶¶ 13, 14).
On November 12, 2009, MERS, which held the mortgage, assigned
the mortgage to GMAC.[4]  (Docket Entry # 61-9, p. 2).

---

        [4]  The assignment identifies MERS as the "holder of [the]
mortgage."  (Docket Entry # 61-9).  It also reads that MERS
"assigns said mortgage and the note and claim secured thereby to
[GMAC]."  (Docket Entry # 61-9).  MERS, however, was not the
holder of the note.  Rather, the summary judgment record shows
that Fannie Mae held the note.  (Docket Entry # 58-1, ¶ 3)
(Docket Entry # 60, ¶ 2).  Plaintiff fails to controvert this
evidence with factual evidence to the contrary.  Allegations or

On March 30, 2010, plaintiff filed a complaint in Massachusetts Superior Court (Norfolk County) ("the Superior Court Action") against inter alia defendant Orlans Moran PLLC ("Orlans"), Fannie Mae and GMAC for violations in the origination and servicing of the loan.  (Docket Entry # 58-1, ¶ 15) (Docket Entry # 62, p. 8, ¶ 15).  On October 9, 2012, GMAC and plaintiff signed the settlement agreement in which GMAC, which serviced the mortgage, agreed to a trial period plan ("the TPP") attached to the settlement agreement.  (Docket Entry # 58-1, ¶ 19) (Docket Entry # 61-13, p. 7) (Docket Entry # 62, p. 12, ¶ 47) (Docket Entry # 65-1, ¶ 47).  Plaintiff, in turn, agreed under the settlement "that if she does not timely comply with all terms of the Trial Plan, [GMAC] is under no obligation to provide a permanent loan modification."  (Docket Entry # 61-13, ¶ C(1)).  The relevant portion of the settlement agreement reads as follows:

> 1.  Loan Modification.  [GMAC] agrees to the Trial Period Plan attached as Exhibit A to this Agreement (the "Trial Plan"), the terms of which are expressly incorporated herein.  Borrower expressly acknowledges that the final terms of a permanent loan modification cannot be determined until after the conditions precedent set forth in the Trial Plan are satisfied by Borrower.  Borrower agrees that if she does not timely comply with all terms of the Trial Plan, [GMAC] is under no obligation to provide a permanent loan modification.

---

statements in plaintiff's opposition brief are not factual evidence.

(Docket Entry # 61-13, ¶ C(1)).

The first paragraph of the settlement agreement identifies the parties to the agreement, namely, "GMAC Mortgage, LLC [('GMAC')] and Heather Harrington [('plaintiff')]." (Docket Entry # 61-13, p. 1). The settlement agreement had a choice of law clause dictating the application of Massachusetts law. (Docket Entry # 61-13, p. 5).

Under the settlement agreement, GMAC also agreed to issue corrections about payment status to credit reporting agencies within 30 days of the filing of the stipulation. (Docket Entry # 58-1, ¶ 20) (Docket Entry # 61-13, p. 3). The relevant portion of the settlement agreement reads as follows:

> 3. Credit Reporting. Within thirty (30) days of the date of the filing of the Stipulation, [GMAC] will issue corrections or amendments to the credit reporting agencies . . . to correct or supplement information about payment status provided to consumer reporting agencies, requesting that such agency(ies) remove references on the Borrower's consumer reports to any arrearages and to any late payments on the Loan for the period of December 1, 2006 through the Effective Date [October 9, 2012], provided however that Borrower acknowledges that all credit reporting agencies are separate entities from [GMAC] and that once these steps have been taken by [GMAC], [GMAC] cannot and will not be held responsible for the actions or omissions of the credit reporting agencies. Accordingly, Borrower acknowledges that [GMAC] cannot guarantee, warrant, or take responsibility for the performance of any credit reporting agency in changing, deleting, or making entries in relation to any derogatory credit information. Borrower warrants, declares, and covenants that she understands the limitations on [GMAC] in this regard and that any error on the part of any credit reporting agency shall not

> constitute a breach of this Agreement by [GMAC], nor shall
> it provide the basis for any action against [GMAC] now or
> in the future related to the action or inaction of any
> credit reporting agency, and any such claims, whether
> existing now or in the future, are hereby specifically and
> expressly waived, discharged and released by Borrower
> against [GMAC].

(Docket Entry # 61-13) (Docket Entry # 58-1, ¶ 20) (Docket Entry # 62, p. 8, ¶ 20).  Three days after the settlement agreement, on October 12, 2012, the parties, including plaintiff, Ally, GMAC, MERS and Fannie Mae, signed and filed a partial stipulation of dismissal in the Superior Court action.  (Docket Entry # 61-14).

The first paragraph of the TPP attached to the settlement agreement identifies the parties to the TPP, namely, GMAC as "Lender and/or Servicer" and plaintiff as "Borrower."  (Docket Entry # 61-13, p. 9).  Under the TPP, plaintiff agreed to make three trial period payments and she made a number of representations to GMAC.  (Docket Entry # 61-13, p. 9).  As stated in the TPP, "Lender/Servicer or agent for Lender/Servicer" was to provide plaintiff with a permanent modification *if* she complied with "all of the provisions" of the TPP and her representations "continue[d] to be true in all material aspects."[5]  (Docket Entry # 61-13, p. 9).  In the TPP,

---

[5]  In a May 2015 Memorandum and Order, this court interpreted this language as creating a condition precedent to a duty to provide a permanent modification.  (Docket Entry # 37).

plaintiff represented that, "There has been no change in the ownership of the Property since I signed the Loan Documents." (Docket Entry # 61-13, p. 9).

On May 14, 2012, GMAC and its parent company, Residential Capital, LLC ("ResCap"), filed for bankruptcy under chapter 11 in the United States Bankruptcy Court for the Southern District of New York ("the Bankruptcy Court"). (Docket Entry # 58-1, ¶ 22) (Docket Entry # 62, ¶ 22). On November 2, 2012, GMAC and Ocwen Loan Servicing LLC ("Ocwen"), as the purchaser, entered into an Asset Purchase Agreement ("the APA"), which included GMAC's servicing agreements with Fannie Mae. (Docket Entry # 59, ¶ 4) (Docket Entry # 59-2). On November 21, 2012, the Bankruptcy Court approved the APA and set out the terms and conditions for the authorization of the sale. (Docket Entry # 58-1, ¶ 31). In pertinent part, the court's Order reads as follows:

> **No Successor Liability.** Neither the Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Interest that arose or occurred prior to the Closing . . .. The Purchaser shall not be deemed . . . to . . . be legal successors, or otherwise be deemed successors to the Debtors.

(Docket Entry # 59-5, p. 27). The provision further stated that:

> . . . the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any

11

> kind or character for any Interests, including under any
> theory of successor or transferee liability, de facto
> merger or continuity, environmental, labor and employment,
> and products or antitrust liability, whether known or
> unknown as of the Closing, now existing or hereafter
> arising, whether fixed or contingent, asserted or
> unasserted, liquidated or unliquidated.

(Docket Entry # 59-5, p. 28).

In January 2013, defendants notified plaintiff that the loan would not be modified.  (Docket Entry # 40-2, pp. 36-42). The stated reason was that there was a misrepresentation by plaintiff, namely, that she failed to disclose there had been changes in the ownership of the property since she signed the note.  (Docket Entry # 40-2, pp. 36-42).  There had been changes in the ownership of the property, since plaintiff signed the note in December 2006:  plaintiff conveyed title to the property from herself to herself and Attorney James Heggie as joint tenants and subsequently as tenants-in-common on April 17, 2007 and on January 11, 2008, respectively.  (Docket Entry # 40-2, pp. 36-42).

In order to transfer GMAC's servicing rights for Fannie Mae agency-owned loans to Green Tree, Fannie Mae's consent was required.  (Docket Entry # 58-1, ¶ 33) (Docket Entry # 59, ¶ 8). On January 23, 2013, Fannie Mae and Green Tree entered into an Agreement with Respect to Servicing Transfer ("the Transfer Agreement").  (Docket Entry # 58-1, ¶ 34) (Docket Entry # 59, ¶

8) (Docket Entry # 59-6, p. 1).  As stated in the Transfer
Agreement, the parties represented that Green Tree was "not
willing to assume" GMAC's warranties and obligations predating
the transfer of servicing rights and that GMAC would "retain its
liability and responsibility" for all warranties and obligations
predating the transfer, as provided by the APA.  (Docket Entry #
58-1, ¶ 35) (Docket Entry # 59, ¶¶ 1, 4) (Docket Entry # 59-6).
GMAC, Ocwen and Green Tree subsequently executed on January 31,
2013 an "Agreement for Partial Assignment and Assumption Under
the Asset Purchase Agreement" (the "Assignment and Assumption
Agreement") pursuant to which Ocwen assigned its rights and
obligations to Fannie Mae agency loans identified in the APA to
Green Tree.  (Docket Entry # 58-1, ¶ 36) (Docket Entry # 59, ¶
9) (Docket Entry # 59-7) (Docket Entry # 59-2, §§ 1.1, 6.15).

    Meanwhile, in an email on January 30, 2013, defendants'
attorney advised plaintiff's attorney that GMAC could not offer
a permanent loan modification in light of the transfers of the
title.  In order to resolve the title issue, however, she
offered plaintiff the option of either removing Attorney Heggie
from the title or adding him to the loan modification as a non-
borrower.  (Docket Entry # 40-2, pp. 40-41).  Although Attorney
Heggie and defendant's counsel briefly discussed the former
option, there is no indication that this occurred.

13

On January 31, 2013, GMAC and Green Tree entered into a Servicing Transfer Agreement ("Servicing Transfer Agreement"). Under the agreement, GMAC transferred the servicing rights for Fannie Mae owned agency loans to Green Tree.  (Docket Entry # 58-1, ¶ 37) (Docket Entry # 59, ¶ 10) (Docket Entry # 59-8).

On February 1, 2013, Green Tree began servicing plaintiff's loan on behalf of Fannie Mae.  (Docket Entry # 58-1, ¶ 38) (Docket Entry # 62, p. 11, ¶ 39) (Docket Entry # 59, ¶ 11). These servicing rights included the Fannie Mae agency loan issued to plaintiff in December 2006.  (Docket Entry # 67, ¶ 4).

In or around April 2013, Green Tree reported current account information to the two credit reporting agencies but did not report information for the period from December 1, 2006 through March 2013.  (Docket Entry # 58-1, ¶¶ 40-41) (Docket Entry # 61-6, 61-7) (Docket Entry # 62, p. 11, ¶ 41).  The credit reporting agencies issue each subscriber a specific code and only allow that specific subscriber which previously furnished the credit information to alter or modify that previously submitted information.  (Docket Entry # 67, ¶ 3). Only GMAC could submit a Universal Data Form ("UDF") to correct any credit information that GMAC previously submitted.  (Docket Entry # 67, ¶ 7).  On November 6, 2013, GMAC assigned the mortgage to Green Tree.  (Docket Entry # 58-1, ¶ 39).

14

On April 23, 2015, the United States District Court for the District of Minnesota ("Minnesota court") in an action filed by the Federal Trade Commission and the Consumer Financial Protection Bureau entered an Order against Green Tree whereby Green Tree was:

> Permanently restrained and enjoined from:  A. Transferring or acquiring servicing for loans in loss mitigation . . . regardless of whether [Green Tree] is the transferor or transferee, unless: . . . 4.  The contract for transfer also includes the following requirements:  a. The transferee will honor loss mitigation agreements entered into by the prior servicer, including but not limited to in-process loan modifications . . . ..

(Docket Entry # 62-2, pp. 28-29, 30-31).  In July 2015, Green Tree offered and plaintiff accepted a "Home Affordable Modification Agreement" pursuant to which the terms of plaintiff's loan were permanently modified effective August 1, 2015.  (Docket Entry # 58-1, ¶ 46) (Docket Entry # 61-16).

## DISCUSSION

### I.  Breach of Contract:  Credit Reporting

Defendants move for summary judgment on both the breach of contract claim in Count I and the breach of implied covenant of good faith and fair dealing claim in Count II on the basis that they were not parties to the settlement agreement and did not assume GMAC's credit reporting obligations.  (Docket Entry # 58, p. 9).  Plaintiff opposes summary judgment submitting that "a

15

clear dispute [exists] as to the material facts" in the record for both claims.  (Docket Entry # 62, p. 20).

A.  Fannie Mae

Defendants contend that Fannie Mae is not liable as a principal of GMAC under plaintiff's theory of agency because GMAC did not serve as an agent of Fannie Mae in the settlement agreement.  Instead, defendants submit that the evidence, including the language of the Settlement Agreement, conclusively establishes GMAC as "an independent contractor, not an agent of Fannie Mae, and, thus, there is no basis to hold Fannie Mae liable under an agency theory."  (Docket Entry # 58, p. 13). Plaintiff argues that GMAC signed the settlement agreement as an agent of Fannie Mae and with the authority to execute documents on behalf of Fannie Mae.

In accordance with Massachusetts law, "An agreement is . . . construed so as to give it effect as a rational business instrument and in a manner which will effectuate the intent of the parties; the parties' intent must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part."  Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) (quotation marks, citations and brackets omitted); accord Shane v. Winter Hill Federal Savings and Loan Association, 492 N.E.2d 92, 94 (Mass. 1986) (contract "construed to give it effect as a rational business instrument

and in a manner which will carry out the intent of the
parties"); Kingstown Corp. v. Black Cat Cranberry Corp., 839
N.E.2d 333, 336 (Mass.App.Ct. 2005).  An agreement is also
examined and construed "'with reference to all of its language
and to its general structure and purpose and in light of the
circumstances under which it was executed.'"  Cofman v. Acton
Corporation, 958 F.2d 494, 498 (1st Cir. 1992) (quoting Radio
Corporation of America v. Raytheon Manufacturing Company, 14
N.E.2d 141 (Mass. 1938)); accord Bourque v. Federal Deposit
Insurance Corporation, 42 F.3d 704, 709 (1st Cir. 1994); In Re
604 Columbus Avenue Realty Trust v. 604 Columbus Avenue Realty
Trust, 968 F.2d 1332, 1357 (1st Cir. 1992).  Thus, "[t]he
parties' intent 'is to be gathered, not from a single sentence,
but from the whole instrument read in the light of the
circumstances existing at the time of negotiations leading up to
its execution.'"  Video Central, Inc. v. Data Translation, Inc.,
925 F.Supp. 867, 872 (D.Mass. 1996) (internal ellipses and
citation omitted).

     Here, these circumstances consisted of the fact that Fannie
Mae owned the loan that GMAC serviced on behalf of Fannie Mae.
Also, as set out in the language of the settlement agreement,
the credit reporting obligation addressed corrections and
amendments made for that loan.  The settlement agreement also
expressly identified GMAC as the servicer.  In addition, the

17

credit reporting provision disclaimed GMAC's liability for "any error on the part of any credit reporting agency" (Docket Entry # 61-13, p. 3), but retained GMAC's obligation to issue corrections and amendments as to payment status of the loan to the credit reporting agencies.  The settlement agreement did "not release . . . claims arising out of the failure of either Party to perform in conformity with the [settlement agreement's] terms." (Docket Entry # 61-13, p. 4, ¶ 6).

The settlement agreement also did not foreclose liability on GMAC's principals and on GMAC's successors-in-interest or attorneys-in-fact arising from GMAC's credit reporting failure. Instead, the credit reporting provision only foreclosed claims against GMAC for errors on the part of the credit reporting agencies.

Defendants nevertheless submit that GMAC signed the Settlement Agreement in its own capacity and not on behalf of Fannie Mae or as an agent of Fannie Mae and the agreement states it is made between GMAC and plaintiff.  "Generally, only parties to an agreement or a contract may be held liable under its terms." In re Tri-Star Technologies Co., Inc., 260 B.R. 319, 327 (Bankr.D.Mass. 2001).  Notwithstanding this general rule, however, courts have found loan servicers to be agents of Fannie Mae.  See R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 187 (1st Cir. 2006) ("[t]ypically, a mortgage servicer acts as the

agent of the mortgagee to effect collection of payments on the mortgage loan"); see, e.g., French v. Chase Bank, N.A., 2012 WL 273724, at *1 n.2 (D.Mass. Jan. 31, 2012) ("[u]nder HAMP, individual loan servicers voluntarily enter into contracts with Fannie Mae, acting as the financial agent of the United States, to perform loan modification services in exchange for certain financial incentives").

Moreover, "An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority, except that the principal is not bound by a contract which is under seal or which is negotiable, or upon a contract which excludes him." Restatement (Second) of Agency § 186 (1958); see Vigdor v. Nelson, 79 N.E.2d 288, 291 (Mass. 1948) (undisclosed trustee liable on contract not made in her name or on her behalf where contract disclosed other principal, was made by agent and there was no seal). As explained in comment (a) of section 186 of the Restatement (Second) of Agency, the rule appears "to violate one of the basic theories of contracts" because the contract "is between the agent and the third person." Restatement (Second) of Agency § 186 cmt. a (1958). "In spite of this, the law of agency finds it expedient to create rights and liabilities between the other party to the transaction and the principal as if the latter were a contracting party." Id. Furthermore, even though GMAC signed

the Settlement Agreement without identifying that it was signing
on behalf of Fannie Mae, the language of the agreement elsewhere
identifies GMAC as the servicer of the loan and refers to Fannie
Mae in the recitals.  Cf. Rogaris v. Albert, 730 N.E.2d 869, 872
(Mass. 2000) (quoting Taber v. Cannon, 49 Mass. 456 (1844), in
parenthetical that, "'It is very clear, that where it is
apparent, from the form of the contract, that the agent intends
to bind himself, and not his principals . . . the principals are
not liable'").  The settlement agreement therefore differs from
the agreement in Motorsport Engr., Inc. v. Maserati SPA, 316
F.3d 26, 29 (1st Cir. 2002), a case relied upon by defendants, in
which the court rejected imposing liability on a third party
beneficiary of the agreement, OAM.  The agreement in Motorsport
stated that it "was 'solely with MAI' and that Majestic shall
'in no event have any right of redress against Maserati S.p.A.
[as OAM was called in the contract] for failure or delay in
delivery.'"  Id.

    It is also a disputed material fact as to whether GMAC
acted as an agent of Fannie Mae.  "In Massachusetts, an agency
relationship . . . arises 'from the manifestation of consent by
one person to another that the other shall act on his behalf and
subject to his control, and consent by the other to so act.'"
Spencer v. Doyle, 1997 WL 625444, at *2-3 (Mass.Super. Oct. 3,

1997) (quoting <u>Harrison Conference Servs. of Massachusetts v.</u>
<u>Commissioner of Revenue</u>, 474 N.E.2d 160 (Mass. 1985)).

To prove that GMAC served as Fannie Mae's agent, plaintiff
must show that:  (1) GMAC had the power to alter the legal
relationships between plaintiff and Fannie Mae and between
plaintiff and GMAC; (2) GMAC had a fiduciary relationship with
Fannie Mae regarding matters within the scope of the agency; and
(3) Fannie Mae had and exercised its right to control GMAC's
conduct with respect to entering into the settlement agreement
with plaintiff.  See <u>Spencer</u> at *2-3; <u>see also</u> <u>Sabel v. Mead</u>
<u>Johnson & Co.</u>, 737 F.Supp. 135, 138 (D.Mass. 1990); <u>Restatement</u>
<u>(Second) of Agency</u> §§ 12-14 (defining essential characteristics
of an agency relationship).  "In determining the existence and
scope of an agency, the courts have focused predominantly on the
issue of control."  <u>Spencer</u> at *2-3.  "Other factors considered
are the language of the agreement and the factual circumstances
surrounding the agreement."  <u>Id.</u>

Here, even though the servicing agreements between Fannie
Mae and GMAC defined GMAC as an independent contractor and not
as an agent, other evidence in the record suggests that GMAC
served as an agent of Fannie Mae when GMAC entered the
settlement agreement.  For example, GMAC was the servicer of the
Fannie Mae agency-owned loan at issue and the reporting
obligations involve that loan.  The settlement agreement was

made in the context of the Superior Court action involving,
inter alia, plaintiff, GMAC and Fannie Mae regarding the
parties' obligations under the loan documents.

Ordinarily, the existence of an agency relationship is ''a
question of fact for the jury . . . [t]o be determined from all
the evidence and reasonable inferences to be drawn therefrom.''
White's Farm Dairy, Inc. v. De Laval Separator Company, 433 F.2d
63, 66 (1ˢᵗ Cir. 1970); Stern v. Lieberman, 29 N.E.2d 839, 842
(Mass. 1940) ("[p]roof of agency is ordinarily a question of
fact").  In light of the material issues of fact, this case is
no exception.  Summary judgment is therefore not warranted for
the breach of contract claim against Fannie Mae regarding the
credit reporting obligation.

B.  Green Tree

Defendants next contend that Green Tree is not liable for
credit reporting obligations in the settlement agreement.
(Docket Entry # 58, pp. 12-13).  Plaintiff alleges that Green
Tree is liable for the credit reporting failure as a successor-
in-interest and/or attorney in fact to the settlement agreement
and also liable for the credit reporting failure under
obligations under the Minnesota court's Order.  (Docket Entry #
40, ¶ 56).

A successor-in-interest is "someone who follows another in
ownership or control of property." Black's Law Dictionary (10th

ed. 2014) (defining successor-in-interest).  Successors-in-interest "to contracting parties are generally not bound by contracts which they have not expressly or impliedly assumed." City of Revere v. Boston/Logan Airport Associates, LLC, 416 F.Supp.2d 200, 208 (D.Mass. 2005).  Courts however have found successors-in-interest bound to contracts with respect to shared understandings of agreements and obligations.  See, e.g., Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 459 (1st Cir. 2013) (noting that bank "would stand in the original lender's shoes" as a successor-in-interest and "be bound by that shared understanding [of an agreement]"); Nicholas v. United States, 384 U.S. 678, 693 n.27 (1966) ("[a]s the successor in interest, the trustee is bound by all authorized acts of the debtor in possession").

In the case at bar, the evidence only provides speculation and conclusory allegations against Green Tree to support the breach of contract claim under an attorney-in-fact theory. Plaintiff's attorney-in-fact allegation fails because the evidence does not show or suggest that Green Tree served as attorney-in-fact for GMAC when GMAC entered into the settlement agreement.  Indeed, Green Tree was not a party to the settlement agreement and had no relationship to the parties at that time. It was not until January 23, 2013 that Green Tree and Fannie Mae entered into the Transfer Agreement.

Turning to the successor-in-interest claim, the Bankruptcy Court Order explicitly prevented Green Tree, as successor-in-interest, from assuming liability for GMAC's prior obligations, which included the credit reporting as defined in the settlement agreement. (Docket Entry # 59-5, p. 27). The Bankruptcy Court Order took effect November 21, 2012, which is more than 30 days after plaintiff filed a stipulation of removal on October 12, 2012 and thus well past the 30-day window provided to GMAC to fulfill its credit reporting obligation. (Docket Entry # 58-1, ¶¶ 19, 31). Consequently, Green Tree did not incur any liability arising from GMAC's failure to fulfill the credit reporting.

Furthermore, the Minnesota court's April 2015 Order does not bind Green Tree in connection with GMAC's prior credit reporting obligation under the October 2012 settlement agreement. The Minnesota court's Order is an injunction effective April 23, 2015, more than two years after the Bankruptcy Court's Order that finalized the transfer of servicing agreements from GMAC. Even if the Minnesota court's Order applied to Green Tree, it only prevents Green Tree from prospectively acquiring loans in loss mitigation unless the contract for transfer permitted the transfer of loss mitigation agreements, another term for settlement agreements, to the new servicer. (Docket Entry # 62-2, pp. 28-29, 30-31). The

24

Bankruptcy Court's Order, however, explicitly prohibited the transfer of successor liability related to GMAC's prior obligations, which included the credit reporting obligation. (Docket Entry # 59-5, p. 27).  Therefore, summary judgment is warranted regarding the breach of contract claim for the credit reporting issue as to Green Tree.

II.  Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants contend that without a contractual obligation for credit reporting under the settlement agreement, they could not breach the implied covenant of good faith and fair dealing. (Docket Entry # 58, p. 9).  In Massachusetts, a claim of a breach of implied covenant of good faith and fair dealing requires a contractual obligation.  See Akar v. Fed. Nat. Mortgage Ass'n, 845 F.Supp.2d 381, 400 (D.Mass. 2012).  As explained in the previous section with respect to Count I, summary judgment is not warranted for the breach of contract claim against Fannie Mae and, for purposes of the summary judgment motion, it is a genuinely disputed issue of material fact as to whether Fannie Mae has a contractual obligation for the credit reporting obligation.  Summary judgment is therefore not warranted for Fannie Mae on Count II.  Conversely, because Green Tree has no contractual liability and summary judgment is warranted on the breach of contract claim in Count I, summary judgment is warranted for Green Tree on Count II.

25

CONCLUSION

In accordance with the foregoing discussion, defendants' motion for summary judgment (Docket Entry # 58) is **DENIED** as to counts I and II brought against Fannie Mae and **ALLOWED** as to counts I and II brought against Green Tree.  As stated in January 2016, there shall be "[n]o further extensions" (Docket Entry # 52) of the summary judgment deadline.  With the deadline having passed, the parties shall appear for a status conference to set a trial date on July 13, 2016 at 3:00 p.m.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge